Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer, 2013 NCBC 14

STATE OF NORTH CAROLINA

COUNTY OF CUMBERLAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 6091

MITCHELL, BREWER, RICHARDSON, )
ADAMS, BURGE & BOUGHMAN; GLENN )
B. ADAMS; HAROLD L. BOUGHMAN, JR. )
and VICKIE L. BURGE, )
                 Plaintiffs )
v. )
)
COY E. BREWER, JR., RONNIE A. )
MITCHELL, WILLIAM O. RICHARDSON, )
and CHARLES BRITTAIN, )
                 Defendants )

**OPINION AND ORDER
DISSOLVING COMPANY
AND APPOINTING SPECIAL MASTER**

THIS MATTER comes before the court upon a directive from the North Carolina Court of Appeals to (a) grant summary judgment in favor of Plaintiffs on the issue of judicial dissolution, pursuant to N.C. Gen. Stat. § 57C-6-02 (hereinafter, all references to the North Carolina General Statutes will be to "G.S."); (b) enter a decree of dissolution and (c) direct the winding up of Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC ("Company"); and

THE COURT, after considering the procedural posture of this action, appropriate matters of record and the ends of justice, and consistent with the directive from the North Carolina Court of Appeals, FINDS and CONCLUDES the following:

*Everett Gaskins Hancock, LLP by E.D. Gaskins, Jr., Esq. for Plaintiffs.*

*Coy E. Brewer, Esq., Ronnie A. Mitchell, Esq., William O. Richardson, Esq. and Charles Brittain, Esq., Pro Se.*

## PROCEDURAL BACKGROUND

[1] On February 1, 2011, the North Carolina Court of Appeals entered an Opinion and Order ("Opinion") on the parties' appeal of this court's March 31, 2009 Order on the parties' respective motions for summary judgment. *Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer*, 209 N.C. App. 369 (2011). The Opinion affirmed in part and reversed in part this court's March, 31, 2009 Order. The Opinion remanded the action for further proceedings, with specific instructions to enter a decree of dissolution of the Company and direct the winding up of the Company, pursuant to G.S. 57C-6-02.3. The Opinion also provided that "[P]laintiffs' derivative claims for an accounting to [the Company] (claim one), an accounting to [P]laintiffs (claim two), and a demand of liquidating distribution (claim three), as well as [D]efendants' counterclaim for a demand for statutory distribution of assets (counterclaim ten), will be addressed by the business court in its directing the winding up of [the Company]."

[2] On March 5, 2012, Plaintiffs filed a Motion for Partial Summary Judgment ("Plaintiffs' Motion"), requesting that this court enter partial judgment in Plaintiffs' favor on certain accounting claims and counterclaims. Plaintiffs requested a distribution of the Company's assets of approximately $79,395 total, payable to individual Plaintiffs Glenn Adams, Harold Boughman and Vickie Burge. Plaintiffs cited the Opinion as authority for this court to proceed with handling certain accounting matters in conjunction with the dissolution and winding up of the Company.

[3] On June 12, 2012, this court held a hearing on Plaintiffs' Motion. At that time, the court denied Plaintiffs' Motion in open court. Also at that hearing, the court informed the parties that it would proceed by entering an order dissolving the Company

and directing its winding up.  The court also informed the parties that it would appoint a referee ("Special Master") to perform an accounting of the Company in order to determine the amount of its assets, if any, and how to distribute the assets to the parties according to the protocols set forth by this court.  Lastly, the court informed the parties that they would be required to compensate the Special Master, including the payment of an upfront retainer fee, for services rendered in this matter.

[4]	The parties agree that a dissolution of the Company is required, as well as an accounting and distribution of its assets.  In fact, both parties have made formal demands for a statutory distribution in their pleadings.  The parties dispute various aspects of the financial and accounting records of the Company and the amounts owed by and to the respective parties.

## Contingent Fee Engagements

[5]	In order to properly direct the winding up of the Company, the court must first address the appropriate manner in which to account for certain contingent-fee engagements of the Company.  A primary point of contention between the parties is the appropriate accounting method for profits derived from the contingent-fee engagements that the Company entered into prior to dissolution but were resolved post-dissolution by Defendants ("Contingent Fee Engagements").  As discussed in more detail below, Plaintiffs contend that all profits from the Contingent Fee Engagements, regardless of when and by whom they were realized, are the property of the Company and subject to a proportional distribution among the Company's former members according to their respective ownership interests in the Company's profits, as agreed by them from time to

time.[1]  Defendants argue that this result would be inequitable and that any portion of profits of the Contingent Fee Engagements that are attributable solely to Defendants' post-dissolution efforts should not be shared with Plaintiffs.

[6]     On August 24, 2012, the court entered an Order on Additional Briefing, requesting that the parties file memoranda in support of their respective positions as to how to account for profits derived from the Contingent Fee Engagements.  Specifically, the issue, as framed by the court, was whether such "fees should be categorized in their entirety (a) as assets of [the Company] or (b) as assets of the [n]ew [f]irm(s) with a quantum meruit accounting owed to [the Company] for legal work on the [c]ases prior to [d]issolution."  It appears to the court that this issue is a matter of first impression in North Carolina.  Briefing on this issue was completed by the end of September 2012, and the issue is ripe for determination.

DISCUSSION

Plaintiffs' Argument

[7]     Plaintiffs take the position that all profits derived from the Contingent Fee Engagements are the property of the Company and must be distributed in their entirety among the Company's former members.  Plaintiffs primarily base this contention upon previous findings by this court, and the court of appeals, that the Contingent Fee Engagements were (a) the property of the Company at the time of dissolution and (b) subject to liquidation and distribution in accordance with the North Carolina Limited Liability Company Act ("Act").  Plaintiffs quote this court's language in its Order on Defendant's Motion to Dismiss in which the court described the duties of LLC managers

---

[1] Paragraph 14 of the Supplemental Amended Complaint alleges that as of the dissolution date, the respective members were entitled to share in Company net profits as follows: Coy Brewer – 19%, Ronnie

upon dissolution:[2]

> The Act provides that upon dissolution, unless otherwise agreed, an LLC such as the [the Company] continues in existence while its managers, or others charged with winding up the affairs of the LLC, have a statutory duty to (a) obtain "[a]s promptly as reasonably possible . . . the fair market value for the [LLC's] assets," and (b) distribute the net balance of those assets to the LLC's Members, and others. G.S. 57C-6-04(b), 05(3). The requirement that the fair market value of an LLC asset be obtained "as promptly as reasonably possible," and the mechanics of how that is achieved, must be viewed relative to the business the LLC conducts and the types of assets it holds. The court can find no reason why law firm Engagements, such as the Contingent Fee Cases, are not capable of being liquidated in a manner consistent with these statutory requirements.

[8]     Accordingly, Plaintiffs argue that it was the duty of Defendants to pursue the Contingent Fee Engagements on behalf of the Company following dissolution in order to wind up the affairs of the Company.  Plaintiffs read G.S. 57C-6-04(b) to contemplate that where the assets of an LLC cannot readily be liquidated at the time of dissolution, there is a duty imposed upon the LLC's former managers "to carry on the firm's unfinished business in order to realize fair market value for its assets."[3] Specifically, Plaintiffs contend that the duty imposed by 57C-6-04(b) requires Defendants to "pursue to conclusion the [C]ontingent [F]ee [Engagements] in process as of the dissolution date."[4]  Plaintiffs argue that all post-dissolution efforts of Defendants to conclude the Contingent Fee Engagements constitute their "winding up" under the Act, and that Defendants must "account [to Plaintiffs] for any proceeds

---

Mitchell – 19%, William Richardson – 19%, Glenn Adams – 12.3333%, Harold Boughman – 10.6668%, Vicki Burge – 10.6668% and Charles Brittain – 9.3111%.
[2] It should be noted that Plaintiffs and Defendants were all managers of the Company, as the Company was a member-managed limited liability company.
[3] Pl. Br. Acct. Method. ("Plaintiffs' Brief") 3.
[4] Id.

derived from [those efforts]."[5]  Plaintiffs' approach to this winding up issue has been accepted in some jurisdictions and loosely has been referred to as the unfinished business method of winding up ("Method").  *See, e.g., Sullivan, Bodney & Hammond v. Bodney*, 16 Kan. App. 2d. 208, 820 P.2d 1248 (Kan. App. 1991); *Ellerby v. Spiezer*, 138 Ill. App.3d 77, 485 N.E.2d 413 (1985); *Jewel v. Boxer*, 156 Cal. App. 3d 171, 203 Cal. Rptr. 13 (1984).  Plaintiffs urge this court to adopt the Method and contend that the Method is "the case law embodiment of the partnership principles codified in North Carolina law through the LLC Act and North Carolina's version of the Uniform Partnership Act . . . ."[6]

[9]     Finally, Plaintiffs argue that a quantum meruit accounting is inappropriate under the present circumstances, contending that (a) quantum meruit is an equitable remedy and the Act provides an adequate remedy at law; (b) a quantum meruit recovery is contrary to the plain language and meaning of the Act, which requires that managers account to the LLC for profits derived from liquidating transactions and (c) Defendants' post-dissolution efforts will be difficult to quantify because Defendants did not keep adequate time records related to the Contingent Fee Engagements following dissolution.[7]

Defendants' Argument

[10]    The primary objection raised by Defendants to Plaintiffs' proposed accounting methodology is that its application will produce inequitable results under the

---

[5] *Id*. 5.  In support of this contention, Plaintiffs rely upon G.S. 57C-3-22, -6-04 and G.S. 59-48, -51 and -60.
[6] Plaintiffs' Brief 5.
[7] The court's conclusions reflected in this Opinion and Order are not based upon an application of quantum meruit principles.  Rather, as discussed *infra* the court reaches its conclusions pursuant to relevant provisions of the Act.

present circumstances.[8]   Defendants contend that a literal application of the Method would require a division and distribution of profits from the Contingent Fee Engagements that does not appropriately account for the extent to which the Contingent Fee Engagements were handled exclusively by Defendants following dissolution.

[11]    Defendants do not take the position that Plaintiffs and the Company have no claim to any portion of the profits from the Contingent Fee Engagements.  Rather, Defendants acknowledge that the Contingent Fee Engagements were assets of the Company at the time of dissolution and that any profits derived therefrom are subject to distribution to some extent.  Defendants argue that any distributions to be made in accordance with the Act should "consider the appropriate rights and methodology in effecting a distribution."[9]

[12]    Defendants urge this court to adopt an accounting methodology that recognizes the extent to which post-dissolution profits from the Contingent Fee Engagements are the product of Defendants' individual skill, effort and diligence.[10] Defendants argue that the Company only has a cognizable property interest in the value that accrued and is attributable to the Contingent Fee Engagements prior to dissolution, given that any value that accrued to the Contingent Fee Engagements following dissolution is due solely to Defendants' efforts.[11]  Accordingly, Defendants contend that they should be required to remit to the Company only the value of net profits ultimately derived from the Contingent Fee Engagements less those profits that

---

[8] Defendants Coy E. Brewer, Ronnie M. Mitchell and Charles Brittain have each submitted briefs on their own behalf.  For present purposes the court will consider the arguments contained in each of the briefs collectively.
[9] Def. Mitchell Mem. Valu. Dist. Meth. (Mitchell Brief) 10.
[10] *Id.* 11.

are attributable exclusively to Defendants' post-dissolution efforts.[12]

[13] Defendants find support for their position in those North Carolina cases that have attempted to value contingent-fee engagements as an asset prior to settlement or verdict. Defendants contend that the present circumstances are analogous to situations in which a firm or attorney is hired on a contingent-fee basis and later the engagement is terminated by the client.[13] Under such circumstances, North Carolina courts have held that the departing attorney is entitled to a quantum meruit recovery for the reasonable value of the services provided to the client prior to termination of the engagement, but not to a charging lien against the amount ultimately recovered. *See, e.g., Mack v. Moore*, 107 N.C. App. 87, 91-92 (1992).[14]

[14] Defendants use *Mack* to demonstrate their contention that North Carolina law recognizes a distinction between the value of a contingent-fee engagement as an asset in the hands of a lawyer prior to settlement or verdict and the fee ultimately derived from the engagement. Thus, Defendants argue, the value of the Contingent Fee Engagements as an asset of the Company is equivalent to the reasonable value of the services actually performed by the Company prior to dissolution, not the fee ultimately realized from the engagement.[15]

<u>The Act</u>

[15] The court notes that the plain language of the Act supports the broad contention that a manager tasked with winding up the affairs of a dissolved LLC must hold any profits derived from the liquidation of the LLC in trust for the LLC, and by

---

[11] *Id.*
[12] *Id.* 6.
[13] *Id.* at 4.
[14] In *Mack*, profits ultimately were realized from the engagement.
[15] *Id.*

extension, the LLC's former members. G.S. 57C-6-04(b), 57C-3-22(e). Further, the plain language of the Act supports the contention that upon dissolution the former members of the LLC are entitled to a distribution of their proportional share of any profits of the LLC, including those profits that are derived by virtue of the liquidation of the LLC's assets. G.S. 57C-6-05(3).

[16] The arguments presented by the parties here, however, cannot be resolved solely by reference to these broad principles. Instead, the appropriate accounting for the Contingent Fee Engagements turns on considerations that are not directly addressed by the Act. This court recognized this possibility in its previous order denying Defendants' Motion to Dismiss, stating:

> This matter has potential to present a host of related, complex issues that are not now before the court. For example, what are the various duties, *vis-à-vis* the Firm and the Defendants' New Firm, of Defendant Members who undertake to manage to their conclusion Contingent Fee Cases that follow Defendants to Defendants' New Firm; and how, if at all, would profits or losses realized from a Contingent Fee Case ultimately resolved by the Defendants' New Firm be shared between the Firm and the Defendants' New Firm? Would it be on a *quantum meruit* basis or otherwise? Further, since the theory underlying the parties' respective positions is not limited to Contingent Fee Cases, how would other Engagements be accounted for between the various Members of the Firm in the context of either withdrawal or dissolution?

[17] The Act does not specifically address whether a former manager who personally undertakes to conclude a personal-service engagement of a dissolved LLC is necessarily and exclusively acting to wind up and liquidate the affairs of the dissolved LLC. The Act only indicates that where those actions would be considered winding up or liquidation, the Act's provisions related to the safeguarding of profits are applicable. Clearly, not all post-dissolution efforts by former members can appropriately be

considered winding up or liquidating the LLC. Similarly, the Act does not specifically address whether all profits derived from the post-dissolution resolution of personal-service engagements of a dissolved LLC are "profits of the limited liability company," without regard for the effort and skill expended by individual members following dissolution. The Act only dictates that where post-dissolution profits may be deemed "profits of the limited liability company" they are subject to distribution to the former members.[16]

### Liquidating the Contingent Fee Engagements

[18] The Act provides that the affairs of an LLC are to be wound up using a typical liquidation process. The Act, however, does not define "liquidation." The court accepts the definition, propounded in Black's Law Dictionary and elsewhere, that liquidation is "the act of converting assets into cash." By definition then, liquidation under the Act is the process of converting that which is an asset of an LLC into cash to be distributed to members under G.S. 57C-6-05(3). In order to fit within the Act's definition of liquidation, the asset being converted to value must in the first place be an asset of the LLC. The extent to which the Contingent Fee Engagements may appropriately be considered assets of the Company is at the heart of the parties' dispute here. The Contingent Fee Engagements unquestionably were an asset of the

---

[16] In concluding that the Act does not specifically contemplate some of the issues raised in the present case, the court notes that G.S. 57C-10-05 allows that in cases not provided for within the Act, the rules of law and equity shall govern. Therefore, the court will consider the equitable arguments raised by Defendants only to the extent necessary to resolve those issues that are not directly addressed by the Act.

Company at the time of dissolution.  The more difficult question is whether the value that accrued to the Contingent Fee Engagements following dissolution may also be said to be an asset of the Company.

[19]    The court notes that a contingent-fee engagement cannot be "liquidated" in the conventional sense of the term.  It cannot easily be shopped to purchasers, placed on the open market or assigned a fair-market price.  The only way in which a contingent-fee engagement may be converted into tangible value is by ultimately reaching a favorable settlement or verdict in the matter.  Even then, the monetary value of a contingent-fee engagement is unknowable prior to settlement or verdict.  How much of any realized fee actually is profit (or loss) to an attorney depends on how long and how expensive litigation of the engagement to a conclusion ultimately proves to be. In light of these uncertainties, a contingent-fee engagement cannot readily be "collected," "disposed [of]," "discharged" or "distributed" at the time of winding up as described in G.S. 57C-6-04(b).[17]

[20]    The difficulty in liquidating contingent-fee engagements by conventional means leads inevitably to the conclusion that the only way in which they may be converted to value following dissolution is by pursuing them to resolution.  Further, it is unrealistic to suppose that all former members will collaborate in order to resolve contingent-fee engagements following dissolution.  As is often the case in a law-firm setting, only a few of the members, perhaps only one, will have been involved personally in the engagement prior to dissolution and possess an adequate familiarity with the client and the subject matter of the litigation to proceed with representation

---

[17] The parties here assume that the "value" at issue results from the profitable resolution of a Contingent Fee Engagement.  They do not address how they would account for an adverse verdict or other negative

following dissolution.  Therefore, the task of pursuing such engagements following dissolution is likely to fall to those members who pursued the engagements prior to dissolution, usually at the affirmative direction of the client.  Practically, this means that following dissolution an individual member or members will pursue the engagements using individual effort and skill without collaboration with former members.

[21]    A strict application of the Method urged by Plaintiffs does not account appropriately for the fact that at least a portion of the value ultimately derived by fees from contingent-fee engagements is the product of a former member's individual skill and effort following dissolution.  As an example, under the Method, an attorney-member who had expended only a few hours on a contingent-fee engagement prior to dissolution and subsequently pursued the engagement for many years would be forced to divide any fee realized in the matter with his former members without regard for the extent to which the fee was the product of the attorney's post-dissolution individual effort.  Conversely, if in pursuing the engagement without collaboration from the former members, the attorney expended years of effort and enormous out-of-pocket expenses only to receive no fee in the matter the attorney could, and likely would, make a demand on the former members to share in all his losses.[18]

[22]    Further, a contingent-fee engagement, as an asset, is a contract to perform personal services.  Where attorneys organize themselves as a limited liability company for the purpose of providing personal services to clients, there can be no distinction drawn between that which is an asset of the LLC and that which is a product of an individual member's personal skill and effort.  It is therefore true, absent an

result in a contingent-fee case in which substantial out-of-pocket expenses had been incurred during the course of the engagement and cannot be recovered from the client.

agreement to the contrary, that a member in a law firm LLC has the right to share – at the agreed percentage or other sharing protocol – in the profits of all engagements of the firm regardless of the member's actual involvement in particular engagements.[19] This right, however, flows from the relationship of the attorneys as co-members of the LLC and the fact that profits from the law firm's engagements are the property of the LLC. Following dissolution, the same principle need not apply. In effect, dissolution should end the right of members to share in the future profits of their fellow members' personal-service engagements. Accordingly, profits attributable to the continued provision of post-dissolution personal services by individual former members should not accrue to the LLC.

[23] Based on the foregoing and under the circumstances of this action, the court declines to adopt the Method advanced by Plaintiffs and concludes that the better approach is one recognizing that:

> "The rule of law is well settled, by the weight of authorities, that neither partner of a dissolved firm is entitled to compensation for services rendered in winding up the partnership affairs unless it is expressly agreed otherwise or can be fairly implied from the circumstances. It seems, however, that the rule should not be extended beyond the requirement of merely winding up the partnership affairs by collecting its outstanding claims, paying debts and distributing the surplus among the members, and that when it appears that time, skill and labor have been expended by a partner in the continuance of partnership business, which inure to the general benefit, he ought to receive, from the profits from his skill and labor, a reasonable compensation, varying according to the nature of the business, the difficulties and results of the undertaking, and its necessity or desirability." *Lamb v. Wilson*, 92 N.W. 167, 168 (Neb. 1902).

---

[18] This is true in so far as those losses would be losses of the LLC under the Method and therefore chargeable against liquidating distributions required to be made under G.S. 57C-6-05(3).

[19] See discussion at paragraphs 24 through 30 of this court's Order on Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6), dated May 8, 2006.

[24]    The court concludes that it was Defendants' duty to pursue in good faith the Contingent Fee Engagements to conclusion following dissolution as part of winding up the affairs of the Company.  However, the efforts by Defendants to pursue the Contingent Fee Engagements should only be considered liquidation of a Company asset to the extent that those efforts served to realize the value that accrued to the Contingent Fee Engagements as of the dissolution date.  Any portion of net profits of the Contingent Fee Engagements attributable exclusively to Defendants' post-dissolution efforts cannot properly be said to be an asset of the Company.  Therefore, it is only that portion of the net fee ultimately derived from the Contingent Fee Engagements that accrued prior to dissolution which Defendants should be required to distribute to former members in accordance with G.S. 57C-6-05(3).

[25]    The court is persuaded, based upon the analogous holding of *Mack* and other similar cases, that the appropriate measure of the value of the Contingent Fee Engagements to the Company is the reasonable value of the services provided by or in behalf of the Company up to the date of dissolution.  Under the present circumstances, the best means by which to measure the reasonable value of pre-dissolution services is to determine (a) the total attorney hours ("Time") expended on a particular Contingent Fee Engagement, both prior to and after dissolution, (b) the percentage of Time that was expended prior to dissolution and (c) the net profit ultimately realized from the Contingent Fee Engagement.  The reasonable asset value to the Company of each such matter would be determined by the percentage of pre-dissolution Time expended relative to the net profit ultimately realized on that matter.  As an example, if a total of 100 attorney hours were expended on a particular Contingent Fee Engagement and 50

of those hours were performed prior to dissolution, the net fee ultimately received by Defendants should be shared 50/50 with Plaintiffs. This method, as opposed to others, best accounts for the risk borne by the Company in initially taking on the Contingent Fee Engagements and also reflects the parties' expectations at the time they entered into the Contingent Fee Engagements.[20]

[26] The court therefore will direct the winding up of the Company in accordance with the findings and conclusions above. In doing so, the court observes that the reasoning relative to liquidation and sharing between the Company and Defendants of ultimate profits from Contingent Fee Engagements ordinarily also would hold true for any professional engagements ("Other Engagements") initially undertaken by the Company but completed and billed for post-dissolution by Defendants. This Opinion and Order is intended to encompass such Other Engagements.

<u>SPECIAL MASTER</u>

[27] The court is convinced, based upon the materials submitted to the court and the arguments of counsel, and pursuant to Rule 53, North Carolina Rules of Civil Procedure ("Rule(s)"), that appointment of a referee ("Special Master") to conduct an accounting of the Company as to the Contingent Fee Engagements and any Other Engagements (collectively the "Accounting") will be in the best interest of the parties.

[28] The court understands that Craig A. Adams, CPA ("Adams") of the accounting firm of Adams, Martin & Associates, P.A., is willing to accept appointment

---

[20] The court recognizes that there are other potential methodologies for determining the respective fiscal interests of the parties in setting the value of professional engagements undertaken by the Company and completed post-dissolution by one or more of the Defendants. Some of those would consider individual attorney hourly rates from time to time for each of the member attorneys. Some would attempt to weigh individual experience and expertise or other such subjective criteria. Without a detailed discussion of those various approaches, but after due consideration of each, the court concludes that other approaches

as Special Master in this matter.  The court concludes that Adams is conversant with law firm accounting, is exceptionally qualified to perform the Accounting and that it is in the best interests of justice and the parties to this matter that he be appointed Special Master forthwith.  The court further concludes that an hourly fee of $255 per hour is fair and reasonable compensation for the time expended by the Special Master in dealing with the accounting in this matter, in addition to an initial administrative fee of $500.

[29]    To conduct the Accounting, the Special Master will need complete access to books and records of the Company and those of Defendants that relate to the Contingent Fee Engagements or any Other Engagements.

[30]    It is important that records of all the parties and the Company be preserved and maintained for purposes of this litigation.

NOW THEREFORE, it hereby is ORDERED that:

[31]    The Company is DISSOLVED, pursuant to G.S. 57C-6-02.  The dissolution of the Company shall be effective as of July 1, 2005 ("Dissolution Date").

[32]    The court appoints Craig A. Adams, CPA, as Special Master, pursuant to Rule 53.  The Special Master shall charge an hourly fee of $255 per hour for his services relative to this matter, and further shall be entitled to an initial administrative fee of $500.

[33]     In undertaking and performing this engagement, the Special Master is authorized to engage the professional services of other members of his accounting firm, at their customary and usual hourly rates, as he reasonably determines are needed.

[34]    The Special Master shall take an account of the Company and the

---

are so speculative, problematical or difficult of proof that they are not appropriate for further examination. Accordingly, no further discussion in that regard is necessary here.

Defendants, consistent with the provisions of this Opinion and Order, and shall:

(a)    Take control of and secure the financial records, or appropriate copies thereof, of the Company;

(b)    Secure the financial records, or appropriate copies thereof, of the Defendants, as they relate to the Contingent Fee Engagements or any Other Engagements;

(c)    Assess the state of the financial records of the Company;

(d)    Assess the state of the financial records of the Defendants as they relate to the Contingent Fee Engagements or any Other Engagements;

(e)    Direct and assist in the preparation of financial statements that state the financial condition of the Company with reasonable accuracy;

(f)    Investigate and report to the court the nature and extent of the outstanding assets and liabilities of the Company;

(g)    If there are Company assets subject to distribution under G.S. 57C-6-05, determine and recommend to the court the amount in which those assets should be distributed to the Company using generally accepted accounting principles and the protocols established in this Opinion and Order;

(h)    With regard to any Company assets available for distribution, determine and recommend to the court the manner and proportions of such distributions to the various members of the Company as of the date of dissolution; and

(i)    The Company shall submit to the Special Master records of all attorney billable hours expended prior to the Dissolution Date on any matter pending as of the Dissolution Date.  This record shall indicate the number of total

billable hours attributable to the Contingent Fee Engagements or any Other Engagements. Defendants shall submit to the Special Master a record of all attorney hours expended on the Contingent Fee Engagements or any Other Engagements.

[35]     All parties to this civil action shall cooperate fully with the Special Master in the performance of his duties.

[36]     The Special Master shall report his finding to the court as soon as practicable and may request from the parties or the court any further information, authority, direction or actions he might need from the court or parties in order to perform the duties reflected in this Opinion and Order.

[37]     Pursuant to Rule 53(d), and on or before April 1, 2013, each individual party litigant in this matter shall provide a retainer fee ("Retainer") to the Special Master in the amount of $5,000. For time expended in dealing with the Accounting, the Special Master shall charge his authorized hourly fee, which in addition to the one-time administrative fee provided for herein shall be deducted from the Retainer on a monthly basis. To the extent the Special Master's fee for services rendered exceeds the Retainer the Special Master shall provide equal monthly invoices to the parties, to be paid within thirty days of the invoice date. The parties shall be responsible to compensate the Special Master until his obligations as set forth by this Opinion and Order are fulfilled. Pursuant to Rule 53(d), at the conclusion of this matter the court will take into account such advancements in the final fixing of costs and will make pro rata adjustments between the parties as the court then deems proper.

[38]     All parties to this civil action are directed to cooperate with the Special Master and provide any and all financial information and records he might request.

[39]     During pendency of this civil action or unless otherwise ordered, all parties are directed not to destroy, remove, alter or obscure any of the financial or otherwise relevant records of the Company.

[40]     This Order shall remain in force and effect until further order of this court.

This the 26th day of February, 2013.